Okay, do we have the lawyers? There may be an issue with the appellant in the last case. His video may have issues, so we may have to have him dial in. Okay, David Sutterfield. We'll hopefully work with it. The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this honorable court. Good morning, ladies and gentlemen. We're ready to hear argument in the first case, which is the City of Taylor Police and Fire Retirement System v. Zebra Technologies. Mr. Hubachek. Good morning, Your Honors. Steve Hubachek, Robbins Geller on behalf of the City of Taylor Police and Fire Retirement System. Your Honors, during the class period, defendants knowingly or recklessly misled investors regarding Zebra's progress in integrating its $3.45 billion Motorola Enterprise acquisition. The reason it struggled to integrate that acquisition was because the latter's IT systems were highly customized, creating significant yet undisclosed problems for Zebra in migrating data from Motorola Enterprise's systems into Zebra's systems. Ultimately, in November 2015, defendants admitted that completion of integration would require huge additional expenditures of $180 million to $200 million. Now this morning, I'd like to address three statements. The first of these is in March of 2015, defendant Gustafson claimed the integration was progressing as planned. But after the class period ended, he admitted that it was not on schedule in spring of 2015. In May and August of 2015, the defendants claimed substantial savings arising from the acquisition had already been captured and that Zebra remained on track for more savings. But it was misleading to tout purported acquisition-related savings at the same time that they were concealing acquisition-related struggles that made huge acquisition-related expenditures inevitable. And this court's decision in Tell Labs 3 demonstrates that these statements were made with cyanide because they were made by Zebra's highest executives regarding what defendants agree is a pivotal acquisition. In addition, the cyanide is also supported by the accounts of two well-described cooperating witnesses, FE1 and FE2. Now turning first to the statement that the integration was progressing as planned, the district court found that this statement was puffery. But that was error, Your Honors. Puffery issues are primarily for the jury. The Supreme Court's decision in TSC and this court's decision in Stransky both emphasize that this is primarily a jury question. Now, with respect to the actual progress of the integration, that was, as this court put in Tell Labs 1, a consequential fact about the company that investors were certainly to be paying attention to and to rely upon. And although progressing as planned is perhaps not as specific as some statements, if you compare that to the statement that was found to be actionable in Tell Labs, you know, that the demand for the lead product of the company was still going strong, it's easily as significant as that statement and as important to investors. And indeed, throughout the process of making the acquisition… It seems, Mr. Hubachek, though, that those statements are qualitatively quite different. The statements that CEO Notabart made about the Titan 5500 in Tell Labs 3 reflect statements about present tense demand for what was a flagship product at the time. A statement, the statement that the, you know, integration is progressing as planned and there are starting to be some synergies realized just seems to be very, very different, a very different kind of statement. And a statement that fits more in line with what we observed in Boeing, that marketplace is sophisticated, the market is going to be well aware that there can be delays with products, and I think here, delays with integration. So, I'd like to hear your response to that.  Well, first of all, I think these are both present tense statements. You know, the fact that the demand is still going strong is a present tense statement, as well as the progressing as planned. In fact, the statement itself was, I believe, that the integration is progressing as planned. So, they're both present tense statements providing important information regarding a crucial issue for the company itself. So, I think that it's similar in both of those regards. And it's also important that this would be information that would be extremely important to investors. Now, throughout this acquisition, beginning even before the acquisition was finalized, the defendants made very clear that integrating this acquisition and bringing it to bear on Zebra's current business will cause these tremendous synergies, which will allow Zebra to realize tremendous savings. That was a connection that was drawn from the very beginning. And, in fact, the defendants, actually in their brief, cited statements indicating that Zebra itself, and this is at Special Appendix 37 and 81, Zebra itself said that the savings that they sought to realize were based upon their ability to achieve the integration within certain cost parameters and in a timely manner. So, I think that Zebra itself is drawing the connection to demonstrate the significance of this issue. And I understand that Your Honor's point, maybe there are arguments being made on both sides. But under TSC and under Stransky, those are questions that should be allowed for a jury to understand and to resolve. Now, with respect to Boeing itself, that was an entirely different situation. I would characterize Boeing and the other case the defendants cited, Hilson, as being cases about predictions. The defendants in those cases predicted that certain things would happen. For instance, in Boeing, they predicted that the plane would fly in a particular air show. And in Hilson, they predicted that repairs would be affected by a particular time. This is not a prediction. This is a statement about the present status of the integration as proceeding according to plan. And that really should be a binary inquiry. Either it was progressing as according to plan or it wasn't. And I think that investors— Even if that's right, though, even if that's right, your line of argument here, where does the second amended complaint allege facts that CEO Gustafson or CFO Smiley, I think that's his name, right, had knowledge that the company was going to incur material IT-related integration costs down the line? Well, your Honor, I think that with respect to—and still focusing on the March statement, I think there are three reasons why, your Honor, I was going to conclude that there was knowledge at that point. The first is analogizing to Tell Labs 3. Basically, we have the highest executives in the company, Gustafson and Smiley, speaking about what is definitely a pivotal issue in the case. That was exactly the sorts of facts that were relied upon in Tell Labs 3, where the highest executives of the company spoke about the demand for the company's lead product. So I think that Tell Labs supports a strong inference of Cyanar in this instance. The district court rejected that, relying upon the lack of motive allegations. But the analysis that the district court employed was basically the same analysis that was actually rejected in Tell Labs 3. It said, well, there was no motive. But in Tell Labs 3, this court posited that an individual could make false statements in the hope that those statements will actually come true later on in the future. And basically, we had a situation where the company was able to conceal the significant problems it was having with respect to integrating its new acquisition for several months. Because the first statement is in March of 2015, and they didn't reveal the actual problems until November of 2015. And it's not the exact amount of money they were going to have to spend. It was the fact that these integration problems were extant throughout the entire class period, and only in November did they first reveal that. Now, Cyanar is also supported by the allegations regarding the confidential informants who experienced the problems that Zebra was experiencing with respect to its integration all the way back in December. It's important to bear in mind that this wasn't a problem that arose during the integration. This was a defect that came with the acquisition. The defects in the IT systems that Motorola Enterprise had came with the acquisition. So these problems would have begun to manifest themselves from the very beginning. And so we have FE1 and FE2 dating back to December of 2014, indicating all the various problems. And then FE2, the former employee number two, indicated that he provided that information directly to Gustafson and Smiley. First, I believe it's in paragraph 54. FE2 said we then had to go tell Smiley and Anders, Anders Gustafson, that we needed to pay a special draw and push up our true-up calculations because the data was so inaccurate. And that's at paragraph 54. And then in August of 2015, there's another phone call in which FE2 brings it again to the attention of Gustafson. So both of those, I think, strongly support the notion of Cyanar. And then there's also the idea that Gustafson knew that this process was off schedule. He admitted that long after the class period was over when he was specifically asked by an analyst, well, was it on schedule in the previous year? And he said no, it wasn't, indicating both his familiarity with the problems and the fact that they were existing for a significant period of time. I'm sorry, I thought I heard one of your honors preparing to ask a question. Now, the second set of questions, second set of statements that we challenged are regarding the captured savings and remaining on track for additional savings. And basically, the issue is the same in this situation. The defendants knew, and by this time had known for months, that there were very significant integration problems. And they nonetheless made statements regarding savings that had been captured. But those statements did not reveal that, in fact, they were experiencing significant problems that ultimately and inevitably would have required them to make serious expenditures. They didn't reveal that at the time. And two analyst reports strongly support the notion that the reasonable investor, and that's the standard under Omnicare, the reasonable investor would have perceived these as offsetting the savings that they announced. And that's it at paragraphs 125 and 75. North Coast Research said increased investments required to grow the business, offsetting increased synergies. And then J.P. Morgan, paragraph 125, called into question the magnitude of the payback on this intense activity based upon this subsequently revealed information. So I think taking together – Don't you think the market's going to expect, of course, there's going to be complexities and delays and unexpected challenges? They bought a business that's much, much larger than theirs, and they've got to peel it out of Motorola and plug it in to themselves. Of course there's going to be challenges. And the argument strikes me as much that you're taking advantage of what became known in time and almost superimposing it back to T1, to the March 17th earnings call and then going forward. And I don't know – Can I go ahead? Yeah, go ahead. I'm sorry to interrupt you, Your Honor. Are you done? Yes, go ahead. All right, thank you. Two things. Number one, we're not trying to superimpose information on these defendants because, as FE2 and FE1 made clear, these were problems that existed long before they spoke in March and August of 2014. So it's not a question of looking back. I mean, ultimately, the amount of money that it cost them is something that was – perhaps wasn't known at that point. But the existence of integration problems was, in fact, known. And second, with respect to – But they don't have a duty to update the market kind of play by play on integration challenges. I agree, Your Honor. The point is that they're creating the impression that everything is going swimmingly. It's going as planned. They're capturing savings. And yet they don't reveal the fact that there are problems that are significantly undercutting those two statements. Your Honor, I've gone past my reserve time. If Your Honors have no further questions, I'd like to say what I have left. Certainly, counsel. Thank you, Your Honors. Mr. Duque. Good morning, Your Honors, and may it please the Court. The district court's opinion should be affirmed for at least two reasons. The first is that it fails to allege that any of the statements challenged were made and were false at the time that they were made. That's a requirement under the PSLRA that requires particularity, and there is no such particularity here. Secondly, the complaint fails to allege facts that give rise to a strong inference of scienter. And those are two independent bases for affirming the district court's opinion here. And as Judge Scudder indicated, at its core, this is really a securities fraud by hindsight kind of claim, where you start from the statement that was made at the end of the class period, November of 2015, and you sort of work your way backwards in time and find statements that were inconsistent. Judge Scudder, as you indicated, this was really a significant transaction for Zebra. It was transformational, and it provided both tremendous upside in the form of additional synergies, but it was also very complex. Anytime you take two large organizations and try to meld them together, it is inevitable that not everything is going to go exactly as planned. But the fact here, Your Honor, is that not only did Zebra advise shareholders of the potential risks of integrating the businesses together, it did provide sort of timely updates about the status of the integration. And in particular, in March of 2015, shareholders were specifically told that as to the IT systems, the internal IT systems, that the company was not going to be integrating those all at once. That, in fact, they were going to be running those on a parallel basis for some period of time, and that's in the record at Supplemental Appendix on page 79. So that's an important part of the… Is that the statement that… I'm sorry to interrupt you. I just want to make sure I got that reference. Is that the statement that Mr. Smiley made during that earnings call? It's not, Your Honor. It's in the 10-K that was filed on that same day in March of 2015. And it's in the record at page 79 of our Supplemental Appendix. Because Mr. Smiley said during that earnings call that ERP implementation is going to take a little bit longer than expected. He did, Your Honor. That's exactly right. He said that in May of 2015. He also said in that same call, Your Honor, that the process of integrating those two systems, which, again, had already been disclosed to shareholders as not having yet occurred, could take up to two years. And so as you look at the chronology here, it's very important to see that starting from March, when the company says we're going to keep these two separate systems in place, we're going to run them in parallel, up until November of 2015, when the company says integrating those two systems together is going to be more costly and time-consuming than anticipated, the company is disclosing all of this information in real time. And there simply are not any facts alleged in the complaint to suggest that any of the statements made in those intervening periods of time were either false. There isn't particularity here, and I'll talk in a minute about the former employees and the admission. But separate and independent from that, there isn't any set of facts that give rise to a strong inference that either Mr. Gustafson or Mr. Smiley knew that those statements were false, or at least were reckless with respect to those statements. And if I could, Your Honor, I want to talk a little bit about the integration is progressing as planned statement, which my friend discussed in his remarks. That was a statement that was made in March of 2015. But as the Supreme Court has instructed in the Omnicare decision, context matters. Context is important. And here, I would commend the panel to take a look at the full context of that sentence. And if you look at Supplemental Appendix Page 63, what you'll see is that that sentence is neither the beginning nor is it the end of the discussion about integration. And in fact, if you look at that entire page, that long page of discussion by Mr. Gustafson, nowhere in that discussion does Mr. Gustafson use the word IT or IT systems. What he does talk about are things like the ability to book and ship products, the fact that employees are energized, talks about the integration of the sales force, he talks about repair operations in Mexico, and so on. And so I think to pluck out of that long discussion a single sentence and then interpret it to mean an unqualified representation that every single aspect of the integration top to bottom was proceeding precisely as planned is an overread. And context, as I said, matters. The other important context, Your Honors, is the fact that on that very same day, that very same day, the company discloses that in fact they're not going to be integrating the two IT systems, that they're going to stand apart for some period of time. And that's the reference that I gave earlier on page 79 of the supplemental appendix in the 10-K, where the company says, and I'm quoting here, until such time as Zebra is able to move on to a single ERP system, Zebra and Enterprise will be operating on separate ERP systems. So when you talk about things progressing as planned, it's really important to know what's the plan. Well, the plan, as disclosed to shareholders, was that there would not be an integration until later in the time period. And again, as you work through the chronology, you'll see that as you move into the summer and then into the fall, as the company began that process of actually physically integrating the two IT systems together, it discovered that there were complexities, that in fact the Motorola systems were actually very highly customized. And so even though on the surface they ran on the same platform, there was a lot of sort of bespoke aspects to the Motorola Enterprises IT system that generated a lot of difficulty. And that was what was disclosed in November of 2015. Your Honor, if I could talk for a moment about the admission, the supposed admission that Mr. Gustafson made in May of 2016. Once again, I think context is important. And I really would, again, commend the panel to the specific Q&A. What's important here, though, is that in May of 2016, Mr. Gustafson was asked a question about whether the company was on schedule a year earlier. And Mr. Gustafson said no. Now, first of all, a year earlier than May of 2016 is May of 2015. And so why is that important? Well, it's important because in May of 2015, Judge Scudder, as you indicated, Mr. Smiley told shareholders that, in fact, the process was going to be a little bit more expensive in the first year than had been anticipated. And so on its face, there's nothing inconsistent with the statement that Mr. Gustafson made in May of 2016 with what Mr. Smiley was telling the shareholders in May of 2015. So that's important. The other fact is, if you look at the full context of the statement, it's pretty clear that Mr. Gustafson is speaking in hindsight. His phrase is, I think what we learned that was different than what we had expected was that the carve-out was more complicated. He's not saying, hey, we knew a year ago that this was going to be much more difficult than we anticipated, but we didn't tell anybody about it. What he's saying is, consistent with the chronology that I laid out earlier, that as the company began the process of physically integrating the systems in the summer and in the fall of 2015, it discovered this was going to be a much larger task than they had initially thought. And that's entirely consistent with what was disclosed in November, where both Mr. Gustafson and Mr. Smiley said, look, this is complex. And it turns out that we didn't really understand the full extent of the complexity until we began the process of physically integrating the systems together. Let me address, if I could, briefly the issue of the synergies statements. And the argument here is that when the company disclosed in May and in August that it was capturing synergies, that somehow that was misleading because the company failed at the same time to disclose these additional one-time integration-related costs. And as I think I've indicated, there simply isn't any set of facts alleged in the complaint that would suggest that Mr. Smiley or Mr. Gustafson actually knew about some additional cost overruns or that there had been some revised cost budget or something and it wasn't disclosed. And so I think both from a standpoint of falsity as well as scienter, that claim fails. But in addition to that, there's a kind of fundamental, I think, mixing of apples and oranges here. When the company is talking about synergies, what it's talking about are run-rate synergies. This is the sort of year-over-year benefits of merging two companies together. So, for example, when you merge two large companies together, you don't need two law departments, right? You can get some savings by merging the two together. That's a benefit that's going to accrue over the long term on a year-over-year basis. Integration costs, on the other hand, are very different. That's the one-time expense associated with merging the companies together. It's almost like the difference between an operating expenditure and a capital expenditure. You don't sort of combine those two things together. We're not suggesting that they're sort of unrelated to each other, but we are suggesting that when the company talks about synergies, it does not thereby undertake an obligation to reveal some additional different metric, even if it was aware that the metric was somehow different than what had been previously disclosed, which, as I've indicated, is not adequately pled in this case. With respect to, you know, some of the cases that my friend identified, Stransky, I think, is a case where it's important to recognize it was a pre-PSLRA case. And so to the extent that the court in Stransky found— We'll give you an initialism like PSLRA wants, but not twice.  Excuse me, Your Honor. Your Honor, my apologies. I'm referring to the Private Securities Litigation Reform Act of 1995. Just refer to it as the Act. Yes, Your Honor. The Act, Your Honor, imposes a set of heightened pleading burdens. The Act was not applicable to Stransky. And so my only point is, to the extent that there are issues with respect to statements about cost curves and the like in Stransky, the court found that those were ambiguous enough to allow the case to go forward. I dare say, Your Honor, that if Stransky were decided under the Act, that it would come out the other way because of the heightened pleading obligations that are imposed upon the plaintiffs. Mr. Duque, can I ask you just a question? It's unrelated to your point, but I want to get the benefit of trying to close out an aspect of the record that's unclear to me. Please, let's stop. We've got an echo someplace. Somebody probably has the YouTube channel playing in the background. Judge Scudder, try again. No, still echo. Who has got a source of sound in the background? Your Honor, I don't think that's us. I'm happy to put us on mute, though, as Judge Scudder asks his question. Judge Scudder, go ahead. We'll see what we can do about this echo. A brief factual question to clarify something. The November 2016 restatement, which I, of course, realize is outside the putative class period, did that restatement include any recording of liabilities that were determined to be out of period that are related to IT integration? No, Your Honor. The restatement had nothing to do with any of the IT integration issues. It was an entirely separate set of issues relating to tax accounting and the like. Thanks. Your Honor, if I could just close up briefly. I want to make a comment about SciENTR and about the Tell Labs decision. And I think the issue with respect to Tell Labs and SciENTR is that the absence of motive here, we're not saying is a dispositive factor. And Tell Labs 3 is very clear on that point. But what we are saying is that in undertaking the holistic assessment of SciENTR, which is what the Supreme Court instructs in its Tell Labs decision, the absence of motive is actually quite significant because it requires the plaintiffs to identify with even greater sort of force facts that would show that notwithstanding the absence of a motive, that the defendants were still acting with an intention to defraud. And so here, this is a very odd fraud scheme that was likely, if it was true, to be revealed in due course and short order. And it's a situation where none of the individual defendants are alleged to have engaged in stock sales or otherwise to have any motive. I think when you take that and combine it with the absence of any well-plaid facts showing actual knowledge by either Mr. Gustafson or Mr. Smiley, there is no strong inference that can be inferred from this record. And with that, your honors, I would ask that the court affirm Judge Leidenweber's decision. Thank you. Thank you, counsel. Mr. Hovacek, anything further? Yes, thank you, your honors. First, if I could just briefly touch on the notion that we're trying to go backward in time here. That's not the case. You've got the admission by Mr. Gustafson, which was unqualified and which was made in the context of discussion of IT issues after the class period that indicated in the spring of 2015 that it was not on schedule. Number two, we have the reports from the FEs, FE1 and FE2, that predated all of the statements. And even more information came out before the May and August statements. And then finally, the problem that was delaying the integration here was inherent in the acquisition itself. So none of those things are attempts to make inferences backwards in time. With respect to the Cyanar here, we're basically just trying to apply the same analysis that this court did in TELABS III. We have the highest executives in the company talking about a pivotal matter repeatedly. The motive issues that the defendants and the district court relied upon are the exact same issues that were addressed and rejected in TELABS III. And then finally, with respect to the context of the admissions that were made by Mr. Gustafson after the class period, those are all unqualified. And they were never at any time was there any sort of attempt to limit those to non-IT issues. And the same thing is true of his first statement that it was progressing as planned. That was an unqualified statement that was not in any way, shape, or form limited such that it would exclude IT issues. I'd ask that the court reverse, and thank you very much. Thank you very much to both counsel. The case is taken under advisement.